OPINION OF THE COURT
Edward J. Greenfield, J.
In this action for the wrongful death of a longshoreman who was killed while attempting to extricate crushed and damaged containers on the container ship Translndiana, a ship owned by defendant and docked at defendant’s pier, defendant moves after a second trial to set aside the jury verdict and have judgment entered in its favor or alternatively to grant a new trial or a substantial reduction of the jury’s award.
The case was originally tried before a jury which found that the defendant was negligent in failing to halt the operations when they were known to be dangerous, but nevertheless found the decedent in proceeding to carry out the task he was assigned to do to have been 70% negligent. The total damages awarded were $260,700. On a posttrial motion, this court held that there could not have been contributory negligence as a matter of law, and that the amounts awarded by the jury were shockingly inadequate. This decision was unanimously affirmed by the Appellate Division (146 AD2d 973), and the negligence of defendant having been determined, the case was remanded for a new trial solely on the issue of damages. On the second trial, a new jury found the damages to be $2,500,000 for lost wages past and future; lost Social Security benefits of $500,000; $2,000,000 to the widow for loss of society, and $250,000 each to decedent’s son and daughter for loss of nurture and care.
TESTIMONY ON LOST EARNINGS
Defendant takes strong issue with the testimony of the economists which was presented to support plaintiff’s claim for loss of earnings. Plaintiff presented two economists. The first, Mr. Eugene Spector, Research Director for the National Maritime Union, had testified about loss of earnings on the *383 first trial, but died before the second trial. His testimony was read into the record. On the basis of decedent’s past work record and the successive collective bargaining agreements which fixed the hourly rate for longshoremen in the Port of New York, Spector calculated that the wages lost by decedent from the date of his death to the date of the first trial in September 1986 was $571,684. Mr. Spector, based on calculations as to the average annual increase in wages, projected that decedent would have earned an additional $677,674 in wages, overtime, and fringe benefits to age 65 and $356,670 more to age 70, plus a loss of $234,000 in Social Security benefits, for a total of $1,840,028.
To counter that testimony, defendant had offered the testimony of its own economist, Professor Patrick Gaughan, that given the declining employment opportunities for longshoremen in the Port of New York, it was unlikely that decedent could have continued with increased earnings until the date of his retirement. He calculated that decedent would have been restricted to collecting his guaranteed annual income after 1981, and that therefore the total loss of earnings would have been $822,621 (excluding 25% fringe benefits and Social Security benefits).
Accordingly, on the second trial, plaintiff offered the testimony of Juan Fernandez, a fellow worker of the decedent, to show that employment opportunities for a person of Escobar’s status and experience were not limited to collecting the guaranteed annual income, and that he could, indeed, have continued increasing his earnings, as Fernandez did. It was explained that Fernandez had become a longshoreman at virtually the same time as Escobar, and that they had worked side by side over the years. They were both rated as "G” men. Their seniority status was virtually identical. Indeed, Fernandez was described as the virtual "clone” of Escobar. When the Seatrain operation closed down, Fernandez was not left unemployed, as defendant contended Escobar would have been, but moved on to other and better jobs at other piers, and was currently making more than twice the guaranteed annual income (GAI). Defendant attempted to show that Fernandez also worked as a straddle crane operator, and that there was no comparability to what Escobar had done. Plaintiff argued Escobar could have done the same thing, and that the wage differential was not substantial. The arguments pro and con were left for assessment by the jury. This testimony was not offered to support the argument that the earnings of Escobar *384 would have precisely replicated the earnings of his workmate, Fernandez, but rather to rebut defendant’s contention that due to shrinkage of the port’s labor force, there was nothing left for Escobar but unemployment and the GAL
Based on this testimony, plaintiff presented the calculations of Dr. Edmund Mantell, Chairman of the Graduate School of Economics and Finance at Pace University, who testified that decedent, but for his death, could have made an additional $4,016,400 in earnings past and future, and in Social Security benefits. While defendant has objected strenuously to the extrapolations of Dr. Mantell, the validity of his calculations was a question argued to the jury. The jury did not adopt his testimony, for it awarded $2,010,000 in total lost earnings, more in line with the projections of Mr. Spector, who calculated total lost earnings of $1,840,028. The jury considered defendant’s contentions that decedent would have been limited only to the guaranteed annual wage in view of the shrinking economic prospects, but it is apparent that it rejected that scenario, as it was entitled to do.
The jury’s calculations obviously were predicated on their finding that at the time of the accident decedent was in excellent health and had extraordinary prospects for longevity. An autopsy disclosed that his arteries were free of atherosclerosis and that his cardiovascular condition was comparable to that of a 20 year old. His subcutaneous fat was one fifth of normal, another factor contributing to longevity. Dr. Michael Baden, former Chief Medical Examiner for New York City, testified that decedent would be grouped within the top 5% of persons his age in terms of life expectancy. His father died at age 89 and his mother was still alive at age 86. Dr. Lawrence Bress, a specialist in geriatric medicine, testified that based on genetic inheritance, decedent’s cardiovascular condition, heart, liver and organs in excellent condition, he could be expected to outlive his parents. Life expectancy tables tell us what may be anticipated in a large group of people of a given age. However, a jury is always told that this is merely a guide, and based on the particular circumstances of the case before them, they may find a life expectancy lower or greater than average. Based on the testimony here, the jury obviously found that but for the accident decedent’s life expectancy would fall into the highest percentiles.
The following table shows the calculations of each economics expert, and the jury’s findings.
*385 [[Image here]]
The arguments put forward by defendant as to the relative merits of the projections of the various economists are most appropriately addressed to consideration by the jury. Of course, all economic projections of future wage loss, since they deal with an unknowable tomorrow, are speculative to some degree, but we permit them nevertheless, not as substitutes for crystal ball gazing or tea-leaf reading, but as reasonable predictions based upon and extrapolated from known past records and events. That the opinions of different experts may differ markedly is one of the basic postulates of trial practice.
APPLICABILITY OF CPLR 5041 — PRESENT VALUE
The projections as to lost earnings made by plaintiff’s original economist, Spector, had already taken the discounted value of decedent’s lost earnings into account. His figures were based on the proposition that wage increases (391% over the past 20 years) and the going interest rate would tend to offset each other, justifying a flat projection. On this trial, although those figures were given to the jury, pursuant to CPLR 4111 (f), the court did not permit the jury to make further calculations discounting earnings to present value.
CPLR 4111 (f) provides, in pertinent part: "In an action brought to recover damages for personal injury, injury to property or wrongful death * * * [i]n itemizing amounts intended to compensate for future damages, the jury shall set forth the period of years over which such amounts are intended to provide compensation. In computing such damages, the jury shall be instructed to award the full amount of future damages, as calculated, without reduction to present value” (emphasis supplied).
This provision was enacted by Laws of 1986 (ch 682, § 7). It was to apply to all actions in which a trial had not been commenced as of August 1, 1988. There was a previous trial of this action, but since the jury verdict on damages was set aside, the trial of this case, which was begun on May 10, 1989, insofar as it related to the computation of damages, was subject to CPLR 4111 (f) and accordingly, the jury was not instructed to reduce future damages to present value.
Defendant evidently accepts this holding, but suggests that the court should structure the payments in accordance with CPLR article 50-B, § 5041. Article 50-B, entitled "Periodic *386 Payment of Judgments in Personal Injury, Injury to Property and Wrongful Death Actions”, was enacted in 1986. It provides, in essence, that in personal injury and wrongful death actions to the extent there is a jury award of future damages in excess of $250,000 (less sums representing litigation expenses and attorneys’ fees), the court shall enter judgment for that excess in the amount of the present value of an annuity contract to pay the future damages in periodic installments. Defendants are required to offer and guarantee the purchase and payment of such an annuity contract.
First, there is a question of whether CPLR 5041 applies to this action, which is wrongful death action under general maritime law, and not under the State wrongful death statute. Even if covered, however, unlike CPLR 4111 (f), which is applicable to trials begun after August 1, 1988, the periodic payment required for awards for future damages in CPLR 5041 "shall apply to all actions commenced or claims filed on or after” July 30, 1986. (L 1988, ch 184, § 20.) The controlling date for CPLR 5041 is the institution of the action, while the applicability of CPLR 4111 (f) is based on when the trial starts. This action was begun in 1977, so by its terms CPLR 5041 (e) does not apply, but the trial started after August 1, 1988, so CPLR 4111 (f) governs.
The two sections, while possibly meant to work together, do not overlap. Given the effective dates of each statute, cases brought before 1986 but tried after August 1988 cannot be permitted to allow jury calculation of present value, but there is no direction for the court itself to compute the present value of future damages. This may be legislative error, or it may be intended for some underlying reason. As noted recently by another Supreme Court Justice facing the same problem, a court is not free to rectify supposed errors, or to speculate as to legislative intent. (Jeras v East Mfg. Corp., 143 Misc 2d 188 [Niagara County 1989].) It must apply the statutory law as it finds it. When the statute sets forth effective dates quite clearly, there is no ambiguity which calls for judicial interpretation. If indeed there is an apparent hiatus for a group of cases, so be it. We take the law as it is. "Courts must avoid judicial legislation even if they believe there are errors or omissions in the legislation” (Murphy v Board of Educ., 104 AD2d 796, 798, affd 64 NY2d 856). "The failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended” (Pajak v Pajak, 56 NY2d 394, 397). "[W]hen * * * the Legislature has *387 specified the cases to which [an act] shall apply, the failure to specify a particular case indicates that the Legislature did not intend the act to cover such case” (McKinney’s Cons Laws of NY, Book 1, Statutes §74, at 158). There is "an irrefutable inference” that what is not included was intended to be excluded. (Patrolmen’s Benevolent Assn. v City of New York, 41 NY2d 205, 208.)
In Jeras (supra), that court also dealt with a case commenced before 1986 and tried in 1989. It instructed the jury, pursuant to CPLR 4111 (f), to award future damages without reduction to present value, but then declined to enter judgment reducing future damages to the present value of an annuity contract pursuant to CPLR 5041. This court must do the same.
As noted by Professor David Siegel in the New York State Law Digest of the State Bar Association (No. 356, at 4 [Aug. 1989]), "The problem will subsist until either the legislature corrects the discrepancy, or the cases in that time limbo are all concluded.” The problem has been recognized in the 1990 Report of the Advisory Committee on Civil Practice to the Chief Administrator of the Courts, which recommends a corrective amendment to CPLR 4111, and notes (1990 McKinney’s Session Laws of NY, at 2835): "Failure to synchronize the effective dates of the two sets of provisions [§§ 4111, 5041] has produced a procedural lacuna in which * * * pre-1986 tort actions, which were not tried before August 1, 1988, although subject to the itemized verdict provisions, are not subject to the structured judgment provisions * * * an anomaly, especially since CPLR 4111 (d) and 4111 (f) provide that, 'In computing said damages, the jury shall be instructed to award the full amount of future damages, as calculated, without reduction to present value.’ ” The suggested amendment would make CPLR 4111 applicable only where the case is controlled by CPLR article 50-B.
In any event, the differences are not substantial. Economist Spector, whose deposition from the first trial was read to the jury, had already effectively reduced his projections as to future lost earnings to present value by offsetting the inflation rate for wages with the going interest rate. The discount rate, as discussed, was 7.5%. It cannot be deducted twice.
CONCLUSION
Defendant has urged that this court set aside the verdict *388 and enter judgment in its favor notwithstanding the verdict. This the court will not do. There was more than ample evidence to warrant the jury’s verdict. The court will, however, grant the motion to set aside the verdict and for a new trial unless plaintiff stipulates to accept an award of $75,000 each instead of $250,000 each for loss of nurture sustained by the children of the decedent. In all other respects the motion to set aside the verdict is denied.
[Portions of opinion omitted for purposes of publication.]